**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. _____

CAMBRIDGE RETIREMENT SYSTEM,
individually and on behalf of all others
similarly situated,

                              Plaintiff,

          v.

MEDNAX, INC., ROGER J. MEDEL, and
VIVIAN LOPEZ-BLANCO,

                              Defendants.

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Cambridge Retirement System ("Cambridge" or "Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Mednax, Inc. ("Mednax" or the "Company") with the United States Securities Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst reports concerning Mednax; and (iv) other public information regarding the Company.

## I.     INTRODUCTION

1.     This class action is brought on behalf of all persons or entities that purchased Mednax's publicly traded common stock between February 4, 2016 and July 27, 2017, inclusive (the "Class Period").  The claims asserted herein are alleged against Mednax and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and

20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.      Mednax is a health care administration business that acquires and administers physician practice groups.  During the Class Period, Mednax's business model depended upon growth from the acquisition of new practice groups, primarily in anesthesiology.  This action arises from Mednax's misrepresentations concerning the sustainability of this business model.  In truth, Mednax's business model is not sustainable and its growth was based upon suppressing physician compensation and enforcing non-compete agreements to deter physician defections.

3.      The Class Period begins on February 4, 2016, when Mednax announced fourth quarter 2015 financial results and assured the market that its business model was sustainable. Throughout the Class Period, Defendants continued to tout the Company's business model and assured investors that there was a strong pipeline for new acquisitions, which would continue to fuel the Company's growth.  For example, on June 7, 2016, the Company's Chief Financial Officer, Vivian Lopez-Blanco, told attendees at the Jeffries Healthcare Conference that Mednax's "pipeline is very robust" and that "there will be more [acquisitions] to come, because we do have plenty in the pipeline… so again, there's a lot of room to grow."

4.      These and similar statements were materially false and misleading because they represented that Mednax's business model was sustainable through the continued acquisition of anesthesiology practices.  In fact, Mednax's business model was not viable and its growth was based upon suppressing physician compensation and invoking non-compete employment clauses to prevent physician departures.

5.      On July 28, 2017, Mednax surprised the market by announcing that it had not acquired any anesthesiology practice groups for that quarter and that the chance of it acquiring any more was remote.  In response to the news, Mednax's stock declined by over 15%.

## II.      JURISDICTION AND VENUE

6.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Mednax maintains its headquarters in Sunrise, Florida, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.      PARTIES

8.      Plaintiff Cambridge represents approximately 5,900 active and retired public employees from Cambridge, Massachusetts, and manages more than $1.3 billion in assets to provide for them in retirement.  As set forth in the attached Certification, Cambridge purchased Mednax securities on the New York Stock Exchange ("NYSE") at artificially inflated prices during the Class Period and suffered damages due to the violations of the federal securities laws alleged herein.

9.      Defendant Mednax is incorporated in Florida with its corporate headquarters located at 1301 Concord Terrace, Sunrise, Florida.  The Company's common stock trades on the NYSE under the ticker symbol "MD."  Mednax currently has approximately 94 million shares of common stock outstanding.

10.     Defendant Roger J. Medel, M.D. ("Medel") was, at all relevant times, Mednax's Chief Executive Officer ("CEO") and a Director of the Company.  Defendant Medel is a co-founder of Mednax and he reassumed the position of CEO in March 2003, a position in which he continues to serve today.

11.     Defendant Vivian Lopez-Blanco ("Lopez-Blanco") was, at all relevant times, Mednax's Chief Financial Officer ("CFO").  Defendant Lopez-Blanco joined the Company in May 2008 as Vice President and Treasurer and was appointed CFO in January 2010.

12.     Defendants Medel and Lopez-Blanco are also collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Mednax, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

4

IV.     **BACKGROUND**

13.     Mednax acquires physician practice groups and then provides those physicians with administration services.  As part of the acquisition process, the affiliated physicians agree to employment contracts with Mednax, which provide for a base salary and incentive bonuses, having terms of three to seven years.  In exchange, Mednax handles billing patients and third-party payors for services rendered by the affiliated physicians.

14.     The Company's "roll-up" business strategy focuses on acquiring physician groups in subspecialties such as anesthesia, newborn, maternal-fetal, radiology and teleradiology, and pediatric cardiology.  Historically, the main driver of Mednax's revenue growth has been acquisitions of anesthesiology practice groups.  In 2016, Mednax added 13 physician groups through acquisitions, including eight anesthesiology practices, and concluded that year with a total of 1,390 affiliated anesthesiologists.

15.     To convince physicians to agree to an acquisition by Mednax, the Company touted the benefits it has offered to physicians and health care systems.  For example, Mednax claimed its management of these practice groups help alleviate the "administrative demands and cost containment pressures" from such sources as commercial and government payors, that "make it increasingly difficult for physicians to effectively manage patient care, remain current on the latest procedures and efficiently administer non-clinical activities."  Mednax also claims that "[b]y relieving many of the burdens associated with the management of a subspecialty group practice, we believe that our practice administration services permit our affiliated physicians to focus on providing quality patient care and thereby contribute to improving patient outcomes, ensuring appropriate length of hospital stays and reducing long-term health system costs."

16.     Moreover, Mednax has claimed that its business model "emphasizes a patient-focused clinical approach" that addresses the needs of its various "partners," including hospitals, third-party payors, referring and collaborating physicians, affiliated physicians and, "most importantly, our patients."  Mednax contends its relationships with its "hospital partners and other customers" as well as its "referring and collaborating physicians" are "critical" to its operations.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

17.     The Class Period begins February 4, 2016, when Mednax misled investors about the sustainability of its business model, which was based upon growth from the acquisition of anesthesiology practice groups.  On that day, Mednax issued a press release, that was also filed with the SEC on Form 8-K, announcing fourth quarter 2015 results.  The Company touted revenue growth of 14 percent, which was "driven primarily by contributions from acquisitions completed since October 2014."  Mednax further disclosed that "revenue growth attributable to recent acquisitions was 15.3 percent."  Defendant Medel was quoted in Mednax's February 4, 2016 press release as stating that Mednax's "fourth-quarter results reflect continued strong growth and strategic milestones" and that Mednax acquired its tenth private practice that year.

18.     Also on February 4, 2016, Mednax held a conference call with analysts and investors to discuss its earnings for the fourth quarter of 2015.  During the call, Defendant Medel described Mednax as a preferred partner for anesthesiologists, boasting that over the past three years "more practices have chosen to join Mednax than any other organization."  He further stated that "based on our pipeline, I believe that we will continue to be one of the most active acquirers in this specialty at reasonable rates."  Medel further stated, "we do have a very full pipeline, a number of good anesthesiology deals in our pipeline at multiples that we consider to be reasonable. And that "our pipeline is very full."

19.     On February 11, 2016, Mednax filed with the SEC its annual report on Form 10-K for the year ended December 31, 2015 ("2015 10-K").  The 2015 10-K touted the Company's business model, stating: "we believe that physicians remain receptive to being affiliated with larger organizations that reduce administrative burdens, achieve economies of scale and provide value-added clinical research, education and quality initiatives."  The 2015 10-K further represented that Mednax's "business model, which has been influenced by the direct contact and daily interaction that our affiliated physicians have with their patients, emphasizes a patient-focused clinical approach that addresses the needs of our various 'partners,' including hospitals, third-party payors, referring and collaborating physicians, affiliated physicians and, most importantly, our patients."

20.     During an April 28, 2016 conference call with analysts and investors to discuss Mednax's first quarter 2016 earnings, Defendant Medel responded to an analyst question about Mednax seeing more "non-anesthesia" deals moving forward by stating: "No, I wouldn't say that at all.  We have got a bunch of deals that are anesthesia and pediatrics-related in our pipeline."

21.     On June 7, 2016, at the Jeffries Healthcare Conference, the Company's CFO, Defendant Lopez-Blanco, touted Mednax's acquisition pipeline, stating: "Our pipeline is very robust… there will be more to come, because we do have plenty in the pipeline as well as, even with these acquisition activities, we have roughly about 2 times leverage ratio.  And so again, there's a lot of room to grow."  She also represented that Mednax's pipeline is "more robust than ever, and it has to do with the fact that physicians, if they want a long-term stable environment know that that's one that Mednax can provide."

22.     The next week during the William Blair Growth Stock Conference held on June 14, 2016, Defendant Medel reassured the market concerning Mednax's business model by stating: "We have successfully completed over 220 practice acquisitions since we went public in 1995, so

we have been a public company now for over 20 years.  And I can tell you I don't have a single

practice that wants to undo their deal and get their practice back or break away from Mednax."

23.     On July 28, 2016, during an earnings call with analysts and investors to discuss the

Company's earnings for the second quarter 2016, Defendant Medel stated:

> In anesthesiology, we've acquired four practices so far this year, and our pipeline
> continues to grow.  Anesthesiology groups increasingly see the need to be a part of
> a larger organization that can support them and invest in the data and technology
> capabilities that their hospital partners are asking of them.  So we see the
> opportunities to continue to grow our footprint as significant, and I anticipate that
> we will have additional acquisitions to discuss with you in the near future.

24.     During the same call, Defendant Medel stated: "We've got a great practice

acquisition pipeline.  We've been closing deals.  We've got strategic growth in our MSO services,

and we've got the financial strength to continue to pursue growth."

25.     Then, on September 7, 2016, during the Robert W. Baird Global Healthcare

Conference, responding to a question about Mednax's acquisition activity in the near future,

Mednax's Vice President for Strategy and Investor Relations, Charlie Lynch ("Lynch") stated:

> we have -- we've completed over 10 practice acquisitions so far this year.  We have
> an excess of that today under signed letters of intent for future acquisition.  Each
> step of the way through this year as we've completed acquisitions, we've been
> successful at adding more to the pipeline and a lot of that has been in anesthesia.
> For the past several years, we've been able to increase our physician base and
> anesthesiology by well north of 20% each year.

26.     During the Company's October 27, 2016 conference call with investors and

analysts to discuss Mednax's earnings for the third quarter 2016, Defendant Medel stated:

> 2016 continues to be one of our busiest years ever for acquisitions.  During the third
> quarter we acquired five practices for a total of 12 practice acquisitions for the year-
> to-date. We added three anesthesia practices, extending our footprint in the West to
> Nevada.  After the quarter we acquired our eighth anesthesia practice this year and
> to date we have expanded our physician population in anesthesiology by more than
> 20%.  Our pipeline remains strong and I am confident that we can close additional
> anesthesia practice acquisitions this year.

27.     During this same October 27, 2016 conference call, Defendant Medel added that Mednax's "strong financial position" was "particularly important given the strength of our practice acquisition pipeline as we look forward" confirming that Mednax had "significant opportunities to put this capital to work in practice acquisitions" and that he expected that Mednax "will continue to be very busy on that front as we wrap up this year and look into 2017."

28.     On November 15, 2016, during the Stifel Healthcare Conference, Lynch touted Mednax's growth through acquisitions, "particularly in anesthesiology," stating: "over the course of the last four or five years, we've not only driven revenue growth that's been generally in the teens through organic growth and through acquisitions, but we've also diversified our revenue sources across different specialties. And you can see some of the wedges growing there, particularly in anesthesiology, as that's been our largest area of activity for acquisitions." Also during this conference, Lynch underscored Mednax's ability to grow through further anesthesiology acquisitions: "our more recent entry into anesthesiology gives us significantly greater population of physicians that we can talk to about joining Mednax." Lynch concluded by stating that Mednax does "see a very active pipeline of practice acquisitions that we continue to go after."

29.     Then, at the Citi Global Healthcare Conference held on December 7, 2016, Defendant Medel touted the Company's "pretty full pipeline for anesthesia" stating:

> "[I]n fact we've acquired more anesthesiology practices over the last 3 years than any one of our competitors.  If it's just about money and you're looking to make 11, 12, 13 times multiple on your practice, we're not going to be the winners.  On the other hand, if you want to join a group of your own peers and you're not going to get flipped in 3 or 4 years and you want to have opportunities to do research and medical education, if your hospital has to approve the sale, we have lots of great relationships with hospitals, etc.  So anyway, we have a pretty full pipeline for anesthesia."

30.     On February 7, 2017, during a conference call to discuss Mednax's fourth quarter 2016 earnings, Defendant Medel reassured investors that the "acquisition market remains very active, and based on our pipeline, I expect that 2017 will be just as busy."  Medel also stated that changes in physician reimbursement would have *a positive impact on the business*: "We're also well-prepared for the changes in reimbursement that will affect anesthesiologists under the macro legislation… we believe the changes in payments under macro can have a positive impact for us."

31.     On February 10, 2017, Mednax filed with the SEC its annual report on Form 10-K for the year ended December 31, 2016, (the "2016 Form 10-K") which represented that Mednax's "business model, which has been influenced by the direct contact and daily interaction that our affiliated physicians have with their patients, emphasizes a patient-focused clinical approach that addresses the needs of our various partners, including hospitals, third-party payors, referring and collaborating physicians, affiliated physicians and, most importantly, our patients."

32.     Mednax also stated in its 2016 Form 10-K that, "we continue to seek to expand our operations by acquiring established physician practices in our specialties which include neonatology, anesthesiology, maternal-fetal medicine and pediatric cardiology."  Moreover, the 2016 Form 10-K cited annual revenue growth driven by acquisitions, rising from $179 million in additional revenue from acquisitions in 2012 to roughly $350 million of additional revenues from acquisitions in each of 2015 and 2016.  In the 2016 Form 10-K, Mednax represented that it "can improve the results" including revenue for all of its acquired physician practices, "through improved managed care contracting, improved collections, identification of growth initiatives, as well as, operating and cost savings based upon the significant infrastructure that we have developed."

33.     Similarly, during the UBS Global Healthcare Conference held on May 23, 2017, Lynch stated that Mednax anticipated it would see "continued growth […]  in anesthesiology through acquisitions."

34.     Finally, on June 13, 2017, while at the William Blair Growth Stock Conference, Defendant Lopez-Blanco touted Mednax's growth in anesthesiology, calling the business "an opportunity and a growth vehicle," additionally stating that "there's 51,000-or-so board certified anesthesiologists, of which roughly we employ 1,400-or-so" and thus "there's a lot of room to grow" in anesthesiology.

35.     The foregoing statements during the Class Period were materially false and misleading because they rendered the impression that Mednax's business model was sustainable through the continued acquisition of anesthesiology practices.  In truth, the Company's business model relied on Mednax's practice of acquiring anesthesiology practice groups and then suppressing physician compensation expenses.  Once their initial employment agreements ended, the anesthesiologists demanded higher compensation.   Mednax's practice of underpaying anesthesiologists hindered its ability to retain these physicians once their post-acquisition contracts expired.  It also led Mednax to threaten enforcement of highly restrictive non-compete agreements that would cause many Mednax physicians to unwillingly renew their agreements.

VI.     **THE TRUTH BEGINS TO EMERGE**

36.     On April 20, 2017, Mednax announced negative financial results for the first quarter of 2017, including missing earnings.  Senior executives, including Defendant Medel, blamed the poor results on negative "trends" including, "payor mix" degradation, lower volume of newborn infant patients, and wage inflation, with half of the financial impact related to business in North

Carolina and Texas.  On this news, the price of Mednax stock declined from $66.69 per share on

April 19, 2017, to $61.30 per share on April 20, 2017, a drop of 8.1%.

37.     On July 28, 2017, Mednax announced, during its second quarter earnings call with

investors and analysts, that the Company failed to complete any acquisitions of anesthesiologist

practices during the quarter.   Significantly, the Company also disclosed that any future

anesthesiologist acquisitions were unlikely, which Mednax attributed to the "challenging" payor

mix combined with "continued… growth in compensation expense for nurse anesthetists."  On

this news, the price of Mednax stock declined from $56.49 per share on July 27, 2017, to close at

$47.73 per share on July 28, 2017, a drop of 15.5%.

38.     Investment analysts covering Mednax expressed surprise by this news.  Stephens

declared that the "magnitude" of the margin deterioration for the period was "alarming" and the

fact that it was purportedly related to "payor mix degradation" and neonatology volume was

"frustrating."  Jefferies concluded that the decision not to acquire anesthesiology practices in 2017

would "result in a deceleration in the company's growth" and "will significantly reduce" Mednax's

"EPS growth outlook."  Jefferies also stated that "for a company known as a 'roll up', this move

will likely translate to a re-rating of its valuation as well" and the "lack of external growth drove

much of the $13.8 million revenue miss versus our 2Q expectation as well as in our 3Q outlook."

## VII.   LOSS CAUSATION

39.     During the Class Period, as detailed herein, Defendants made materially false and

misleading statements and omissions, and engaged in a scheme to deceive the market.  This

artificially inflated the price of Mednax securities and operated as a fraud or deceit on the Class

(as defined below).  Later, when Defendants' prior misrepresentations and fraudulent conduct were

disclosed to the market, the price of Mednax stock fell.  As a result of their purchases of Mednax securities during the Class Period, Plaintiff and other members of the Class suffered harm.

## VIII.    CLASS ACTION ALLEGATIONS

40.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of Mednax during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Mednax and their families and affiliates.

41.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Mednax has over 94 million shares of common stock outstanding, owned by hundreds or thousands of investors.

42.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)    Whether the price of Mednax common stock was artificially inflated;

(f)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

      (g)    The extent of damage sustained by Class members and the appropriate measure of damages.

43.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

44.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

45.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

46.    Mednax's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

47.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Mednax who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.    PRESUMPTION OF RELIANCE

48.    At all relevant times, the market for Mednax's common stock was an efficient market for the following reasons, among others:

(a)     Mednax stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Mednax filed periodic public reports with the SEC and NYSE;

(c)     Mednax regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Mednax was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

49.     As a result of the foregoing, the market for Mednax common stock promptly digested current information regarding Mednax from all publicly available sources and reflected such information in the price of Mednax common stock.  Under these circumstances, all purchasers of Mednax common stock during the Class Period suffered similar injury through their purchase of Mednax common stock at artificially inflated prices and the presumption of reliance applies.

50.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.

## COUNT I

### For Violations Of Section 10(b) Of The
### Exchange Act And Rule 10b-5 Against All Defendants

51.     Plaintiff repeats, incorporates and realleges each and every allegation contained above as if fully set forth herein.

52.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Mednax common stock at artificially inflated prices.

53.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Mednax common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

54.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

55.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Mednax's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

57.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Mednax common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Mednax common stock had been artificially inflated by Defendants' fraudulent course of conduct.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

59.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act Against The Individual Defendants

60.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

61.     The Individual Defendants acted as controlling persons of Mednax within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Mednax, the Individual Defendants had the power and ability to control the actions of Mednax and its employees.

62.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

XI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

XII.   **JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: July 10, 2018

KLAUSNER, KAUFMAN, JENSEN
   & LEVINSON

*/s/ Robert D. Klausner*
Robert D. Klausner
Florida Bar Number 244082
Stuart A. Kaufman
Florida Bar Number 979211
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**

*/s/ Avi Josefson*
_____

Avi Josefson
Michael Blatchley
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
avi@blbglaw.com
michaelb@blbglaw.com

*Attorneys for Plaintiff Cambridge
Retirement System*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Francis E. Murphy, III, on behalf of Cambridge Retirement System ("Cambridge"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of the Board of Cambridge. I have reviewed the complaint and authorize its filing.

2. Cambridge did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Cambridge is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Cambridge's transactions in the Mednax, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Cambridge has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

   *Luna v. Marvell Technology Group, Ltd.*, No. 15-cv-5447 (N.D. Cal.)
   *French v. CBL & Associates Properties, Inc.*, No. 16-cv-165 (E.D. Tenn.)

6. Cambridge has served as a representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

   *In re Willis Towers Watson plc Proxy Litigation*, No. 17-cv-1338 (E.D. Va.)

7. Cambridge will not accept any payment for serving as a representative party on behalf of the Class beyond Cambridge's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of July, 2018.

_Francis E. Murphy III_
Francis E. Murphy, III
Board Chairman
*Cambridge Retirement System*

**Cambridge Retirement System**
**Transactions in Mednax, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 4/25/2016 | 1,189 | 72.0633 |
| Purchase | 4/26/2016 | 1,303 | 72.0200 |
| Purchase | 4/27/2016 | 1,426 | 72.5097 |
| Purchase | 4/28/2016 | 3,991 | 70.6481 |
| Purchase | 4/29/2016 | 1,202 | 70.9815 |
| Purchase | 5/2/2016 | 1,701 | 70.4380 |
| Purchase | 5/3/2016 | 1,088 | 69.9983 |
| Purchase | 5/5/2016 | 2,027 | 69.0429 |
| Purchase | 5/6/2016 | 1,193 | 69.2909 |
| Purchase | 5/9/2016 | 423 | 69.6223 |
| Purchase | 5/10/2016 | 364 | 69.7264 |
| Purchase | 5/11/2016 | 423 | 69.2968 |
| Purchase | 5/12/2016 | 1,688 | 68.7003 |
| Purchase | 5/13/2016 | 2,082 | 68.5606 |
| Purchase | 6/7/2016 | 441 | 69.6751 |
| Purchase | 6/8/2016 | 376 | 70.2770 |
| Purchase | 6/9/2016 | 265 | 70.0599 |
| Purchase | 6/10/2016 | 1,061 | 68.8572 |
| Purchase | 6/13/2016 | 1,091 | 68.7152 |
| Purchase | 6/14/2016 | 1,831 | 68.9456 |
| Purchase | 6/15/2016 | 689 | 69.3161 |
| Purchase | 6/16/2016 | 446 | 68.4878 |
| Purchase | 6/24/2016 | 500 | 69.9700 |
| Purchase | 7/22/2016 | 100 | 75.7242 |
| Purchase | 7/28/2016 | 5,425 | 69.7879 |
| Purchase | 7/29/2016 | 75 | 69.4510 |
| Purchase | 9/2/2016 | 1,089 | 66.2638 |
| Purchase | 9/6/2016 | 1,211 | 66.6755 |
| Purchase | 10/10/2016 | 200 | 67.0377 |
| Purchase | 11/3/2016 | 1,900 | 60.9650 |
| Purchase | 11/7/2016 | 1,500 | 61.2660 |
| Purchase | 4/11/2017 | 100 | 68.2730 |
| Purchase | 4/28/2017 | 2,100 | 60.6244 |
| Sale | 5/31/2016 | (1,001) | 68.4500 |
| Sale | 6/27/2016 | (200) | 68.0200 |
| Sale | 6/23/2017 | (2,499) | 59.9711 |