UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:18-cv-61572-WPD

CAMBRIDGE RETIREMENT SYSTEM,
Individually and on behalf of all others
similarly situated,

Plaintiff,

v.

MEDNAX, INC., ROGER J. MEDEL, VIVIAN
LOPEZ-BLANCO, and CHARLES W. LYNCH

Defendants.

## ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT

THIS CAUSE is before the Court on Defendants MEDNAX, Inc. ("MEDNAX" or the "Company"), Roger J. Medel, M.D. ("Medel"), Vivian Lopez-Blanco ("Lopez-Blanco), and Charles W. Lynch ("Lynch," collectively with Medel and Lopez-Blanco, the "Individual Defendants") (collectively, "Defendants") Motion to Dismiss First Amended Complaint [DE 62] (the "Motion"). The Court has carefully considered the Motion, Lead Plaintiff's Response [DE 64], Defendants' Reply [DE 66], and is otherwise fully advised in the premises.

### I.    Background[1]

### A.  Overview

This is a federal securities action against MEDNAX, Medel, Lopez-Blanco, and Lynch, for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  Defendant MEDNAX is a health care administration company that acquires and administers physician practice groups. ¶ 2.  Plaintiffs

---

[1] The facts in this section are taken from the Amended Complaint [DE 53].

1

allege that during the Class Period, Defendants engaged in a fraudulent scheme to artificially inflate MEDNAX's stock price by making false statements indicating that MEDNAX's business model was sustainable and that the Company could continue acquiring new anesthesiology practices to drive growth, whereas, in fact, unbeknownst to investors, adverse trends were undermining the economics of anesthesiology practices and forcing the Company to reconsider its growth strategy, and the number of acquisition opportunities was dwindling amid the Company's deteriorating reputation among anesthesiologists. ¶¶ 1, 3.

## B. The Parties

Plaintiff Northern Ireland Local Government Officers' Superannuation Committee ("NILGOSC") was appointed to serve as Lead Plaintiff in this action by Order of this Court dated December 21, 2019. [DE 47]. Plaintiff purchased MEDNAX securities on the New York Stock Exchange ("NYSE") at artificially inflated prices during the Class Period and suffered damages as a result of the alleged violations of the federal securities laws. ¶ 11.

Defendant MEDNAX, co-founded by Defendant Medel, is a health care administration company that acquires and administers physician practice groups. ¶¶ 2, 13.  MEDNAX is a Florida corporation with corporate headquarters in Sunrise, Florida. ¶ 12.

Defendant Medel was, at all relevant times, MEDNAX's Chief Executive Officer ("CEO") and a Director of the Company. Defendant Medel is a co-founder of MEDNAX and reassumed the position of CEO in March 2003, a position which he continues to hold today. ¶ 13.

Defendant Lopez-Blanco was, at all relevant times, MEDNAX's Chief Financial Officer ("CFO"). ¶ 14.  Defendant Lopez-Blanco joined the Company in May 2008 as Vice President and Treasurer and was appointed CFO in January 2010. ¶ 14.

Defendant Lynch was, at all relevant times, MEDNAX's Vice President for Strategy and Investor Relations. ¶ 15.  Defendant Lynch joined the Company in April 2014, and remains at that position today. ¶ 15.

### C. The Class Period

The Class Period begins on February 4, 2016 and ends July 28, 2017. ¶¶ 29, 100.

### D. The Alleged Misrepresentations and Omissions

Plaintiff alleges that Defendants defrauded investors when they disseminated false and misleading statements about MEDNAX's business model. *See generally* [DE 53].  MEDNAX earned revenue from acquiring physician practices and contracting with hospitals to provide physician services. ¶ 2.  MEDNAX's business model was based on and depended upon growth from the acquisition of new practice groups, primarily in anesthesiology. ¶ 2.  Thus, success of the Company was based on its ability to acquire new practice groups which, in turn, enabled the Company to grow in both revenues and earnings per share. ¶ 2.

Throughout the Class Period, Defendants touted the Company's business model and assured investors that there was a strong pipeline for new acquisitions, which would continue to fuel the Company's growth. ¶ 4.  However, Plaintiff alleges, these statements by Defendants that there was a strong pipeline for new acquisitions and that the Company was signing Letters of Intent ("LOI") were false because, unbeknownst to investors, adverse trends were undermining the economics of anesthesiology practices and forcing the Company to reconsider its growth strategy, and the number of acquisition opportunities was dwindling amid the Company's deteriorating reputation among anesthesiologists. ¶¶ 3, 4.  Thus, Plaintiff contends that whenever Defendants made positive statements about the Company's strong position and robust pipeline, Defendants lied to MEDNAX's public investors about the most important aspects of its business model. *See generally* [DE 53].  "This action arises from Defendants' false statements indicating

3

that MEDNAX's business model was sustainable and that the Company could continue acquiring new anesthesiology practices to drive growth." ¶ 3.

Plaintiff concedes in its allegations that Defendants did on multiple occasions disclose adverse trends affecting its business model, but implies that the adverse trends should have been disclosed earlier and/or more strongly emphasized and the failure to do so conveyed to the public a false impression as to the success and sustainability of the MEDNAX business model and the Company. *See generally* [DE 53].

Plaintiff also concedes in its allegations that that the price of MEDNAX stock had significant drops on April 19-20, 2017 (declined $5.39 per share, or more than 8%, from a close of $66.69 per share on April 19, 2017, to close at $61.30 per share on April 20, 2017) and on May 4, 2017 (declined $4.38 per share, or more than 7%, from a close of $60.43 per share on May 3, 2017, to close at $56.05 per share on May 4, 2017) due to the Company's announcement of poor results that MEDNAX acknowledged and attributed to a handful of adverse trends. *See* [DE 53] at ¶¶ 78-86.

Nonetheless, the First Amended Complaint alleges that the "truth [was] revealed" on July 28, 2017 when MEDNAX filed its 10-Q for the second quarter of 2017 on July 28, 2017 wherein the Company reported on its financial results. ¶ 100. There is no allegation that the 10-Q restated any of the Company's past financial reporting. *See id.* Net revenue for the quarter increased by $71.1 million (or 9.2%) compared to the same period in 2016; however, the Company noted in an accompanying press release that same-unit revenues declined by 0.6% due to reimbursement-related factors, and an additional 0.3% due to lower patient volumes. ¶ 100. Medel also stated in the press release that the "trends we experienced earlier in the year, in both payor mix for anesthesia services and volume trends in neonatal services, remained a challenge during the quarter, impacting our same-unit revenue compared to the prior year." ¶ 100.

In the earnings call that day, Medel explained that "what we have continued to see is either slight growth or modest declines in our commercial volumes and faster growth in both Medicare and self-pay volumes" and that "[w]e've also continued to see growth in compensation expense for nurse anesthetists." ¶ 102. Medel also stated that the "trends we have seen in our anesthesia business led us to make some strategic decisions during the quarter related to acquisitions. I know we didn't complete any anesthesiology acquisition during the [second] quarter . . . [b]ut that was on purpose." ¶ 102.  In that regard, Medel elaborated that "the impact of what we've seen in both the same-unit revenue growth and compensation expense are significant, and we continue to account for our expectations that those trends will persist in the near future." ¶ 103.  Medel further explained that "the trends we began seeing earlier this year" "affect the valuation for the practices." Based on those trends, he explained that the Company attempted to renegotiate two acquisitions that it was preparing to finalize, resulting in neither of them closing. ¶ 101.  Medel also noted that future acquisitions "will be done in a deliberate fashion and with a heavy focus on valuations that we're willing to pay." ¶ 101. Notwithstanding, Medel maintained that MEDNAX "remain[s] committed to our growth in anesthesia, and I expect that we will complete additional practice acquisitions in this specialty." ¶ 103.  Medel and Lopez-Blanco stated that MEDNAX contemplated limited contribution from future acquisitions due to the factors that already had impacted results in 2017 and the uncertainty as to the closing of future acquisitions. ¶¶ 103-05.  Following these announcements, the price of MEDNAX stock declined $8.76 per share, or approximately 15.5%, from the $56.49 per share close on July 27, 2017. ¶ 106.

The First Amended Complaint does not plead specific facts showing that any particular statement was false at the time it was made.  Rather, Plaintiff simply repeats the same litany of boilerplate allegations—seventeen times—after each of Defendants' statements, asserting that

the statements were false because they omitted the material facts that MEDNAX's strategy was

not sustainable because market trends negatively affected the profitability and valuations of

anesthesiology practices and these adverse trends, coupled with alleged dissatisfaction of

anesthesiologists in already-acquired practices, made it more difficult for MEDNAX to close on

anesthesiology deals. *See* ¶¶ 35, 39, 46, 48, 50, 55, 58, 64, 66, 68, 72, 76, 80, 89, 91, 96, 98.

As an illustrative example, Plaintiff alleges the following materially false and misleading

statements were made by Defendant Lopez-Blanco on June 7, 2016:

> On June 7, 2016, at the Jeffries Healthcare Conference, Defendant Lopez-Blanco continued the Company's campaign of touting MEDNAX's acquisition pipeline, stating: "Our pipeline is very robust at this time . . . there will be more to come because we do have plenty in the pipeline, as well as even with these acquisition activities, we have roughly . . . two times leverage ratio. And so again, there's a lot of room to grow." She also represented that MEDNAX's pipeline is "more robust than ever, and it has to do with the fact that physicians, if they want a long-term stable environment, know that that's one that MEDNAX can provide."

[DE 53] at ¶ 47. Plaintiff does not allege that Lopez-Blanco's statement was false because

MEDNAX in fact did not have plenty of deals in the pipeline when she made this statement.

Rather, Plaintiff alleges that Lopez-Blanco's statement was materially false and misleading

because of the following boilerplate list that the First Amended Complaint applies to each and

every allegedly false and misleading statement:

> (a) MEDNAX's strategy of growing revenue by acquiring new anesthesiology practices was not sustainable;
> (b) MEDNAX was experiencing a shift toward lower-margin government and self-pay payors, as well as growth in compensation expense for nurse anesthetists, which together were affecting the profitability of acquired anesthesiology practices and the valuations of practices that the Company was considering purchasing;
> (c) the changing economics of MEDNAX's acquired anesthesiology practices were undermining the Company's ability to turn profits on those practices, and was forcing the Company to re-examine whether it should continue acquiring anesthesiology practices;
> (d) in order to continue acquiring anesthesiology practices in a sufficiently profitable manner, MEDNAX would need to purchase those practices at lower prices than it had done so previously, but physicians who had sold practices were

often already dissatisfied with the price and salary terms of the acquisitions, making it infeasible for MEDNAX to lower purchase prices any further and thus impossible for MEDNAX to continue acquiring new anesthesiology practices at sufficiently profitable prices;

(e) MEDNAX's relationships with the anesthesiologists it employed and its reputation among anesthesiologists in practices not acquired by MEDNAX were deteriorating to the point that it was difficult for the Company to attract and retain anesthesiologists to fulfill the Company's contracts with hospitals; and

(f) due to the failing economics of new practice acquisitions and anesthesiologists' lack of desire to become affiliated with MEDNAX, the market for new acquisitions was contracting and the Company was growing increasingly unable to find new anesthesiology practices to purchase.

[DE 53] at ¶ 47.

The First Amended Complaint asserts two causes of action: (1) Count I, under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, against all Defendants; and (2) Count II, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the individual Defendants Medel, Lopez-Blanco, and Lynch. *See* [DE 53].

## II. Applicable Law

### a. Motion to Dismiss Standard

To adequately plead a claim for relief, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating *Conley*, 355 U.S. at 41). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). The allegations of the claim must be taken as true and must be read to include any theory on which the plaintiff may recover. *See Linder v.*

7

*Portocarrero*, 963 F. 2d 332, 334-36 (11th Cir. 1992) (citing *Robertson v. Johnston*, 376 F. 2d 43 (5th Cir. 1967)). The court need not take allegations as true if they are merely "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949. In sum, "a district court weighing a motion to dismiss asks not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Twombly*, 550 U.S. at n.8. (internal quotation omitted).

#### b.   Section 10(b), Rule 10b-5, and Section 20(a)

To state a claim for securities fraud under Section 10(b) of the Act and Rule 10b–5, a plaintiff must allege six elements:  "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on a misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called loss causation." *Instituto De Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1352 (11th Cir. 2008) (quotation omitted). Under Section 20(a) of the Exchange Act, to state a claim for controlling person liability against a defendant, it must be alleged that the defendant had:  (1) the power to control the general affairs of the entity primarily liable for the Section 10(b) or Rule 10b–5 violation at the time of the violation, and (2) the power to control or influence the specific policy that resulted in the primary violation under Section 10(b) or Rule 10b–5. *In re Unicapital Corp. Sec. Litig*., 149 F.Supp.2d 1353, 1367 (S.D. Fla. 2001) (citing *Brown v. Enstar Group, Inc*., 84 F.3d 393, 396 (11th Cir. 1996)). "Section 20(a) is not a freestanding claim but is merely a means of imposing liability, not only on the person who actually commits a securities law violation, but also on an entity or individual that controls the violator." *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1288 (S.D. Fla. 2011) (quoting *Theoharous v. Fong*, 256 F.3d 1219, 1224 (11th Cir.2001), abrogated on other grounds by *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010)).

8

To survive a motion to dismiss, a claim brought under Section 10(b) of the Act or Rule 10b–5 must satisfy not only the federal notice pleading requirements under Fed. R. Civ. P. 8, but must also satisfy:  (1) the special fraud pleading requirements found in Fed. R. Civ. P. 9(b), *see Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001); and (2) the additional pleading requirements imposed by the Private Securities Litigation Reform Act (the "PSLRA"), *see Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004).

Rule 9(b) requires that, for complaints alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b) dictates that the complaint must allege:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). The PSLRA imposes additional heightened pleading requirements. For Section 10(b) and Rule 10b–5 claims predicated on allegedly false or misleading statements or omissions, the PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Specifically, the complaint must "plead with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the alleged materially false or incomplete statements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quotation marks omitted).

9

### c.  Judicial Notice

"In determining whether to grant a Rule 12(b)(6) motion, the Court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Watson v. Bally Mfg. Corp.*, 844 F. Supp. 1533, 1535 n.1 (S.D. Fla. 1993), *aff'd*, 84 F.3d 438 (11th Cir. 1996). When a plaintiff refers to documents in the complaint that are "central to the plaintiff's claims," the Court "may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require the conversion of the motion into a motion for summary judgment." *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). Additionally, the Eleventh Circuit has expressly held that a court may judicially notice relevant documents legally required by, and publicly filed with, the Securities and Exchange Commission. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276–81 (11th Cir. 1999). As the Eleventh Circuit stated, the "usual rules for considering 12(b)(6) motions are thus bent to permit consideration of an allegedly fraudulent statement in context." *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999); *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1279 (S.D. Fla. 2008). The Court has considered such documents as appropriate.

### III.  Discussion

Defendants contend that the First Amended Complaint is comprised of mere fraud-by-hindsight allegations that fail to adequately plead a claim for violation of the securities laws. Defendants argue that the First Amended Complaint should be dismissed because the statements at issue are not actionable as a matter of law because they are forward-looking statements of corporate optimism that are immaterial.  Defendants also assert that Plaintiff fails to plead facts showing that any statement was false or misleading.  Rather, the allegations in the First

Amended Complaint establish that Defendants disclosed adverse economic trends as they emerged.  Defendants further argue that the First Amended Complaint must be dismissed for failure to allege facts that would give rise to a strong inference of scienter.

The Court will set forth each of the allegedly materially false and misleading statement pled in the First Amended Complaint, grouped into the 2016 statements and the 2017 statements, and then analyze the arguments raised for dismissal.

For the reasons set forth below, the Court will grant Defendants' Motion to Dismiss First Amended Complaint, and dismiss the First Amended Complaint with leave to amend.

### a. The 2016 Materially False and Misleading Statements

The First Amended Complaint alleges that Defendants made false and misleading statements and material omissions in 2016 on the following ten (10) dates: February 4, 2016; February 11, 2016; April 28, 2016; June 7, 2016; June 14, 2016; July 28, 2016; September 7, 2016; October 27, 2016; November 15, 2016; and December 7, 2016. *See* [DE 53] at ¶¶ 29-68. The 2016 statements are set forth below:

#### A. February 4, 2016

29. The Class Period begins February 4, 2016, when MEDNAX issued a press release announcing fourth quarter 2015 results, which was also filed with the SEC on Form 8-K. The Company touted revenue growth of 14 percent, which was "driven primarily by contributions from acquisitions completed since October 2014." MEDNAX further disclosed that "revenue growth attributable to recent acquisitions was 15.3 percent, while overall same-unit revenue declined by 1.3 percent when compared to the prior year period." Defendant Medel stated in the press release:

> Our fourth-quarter results reflect continued strong growth and strategic milestones. . . . We completed the acquisition of our tenth private practice for the year, and we also increased our financial flexibility through our entry into the dent securities markets. For the year as a whole, in addition to these physician practice acquisitions, we established a leading presence in teleradiology, and we realigned our operating infrastructure to enable enhanced cross-selling of our services, responsiveness to our customers' needs, and enhanced opportunities to generate organic growth. Entering 2016, we believe our competitive positioning will be significantly improved by these achievements, as well as our ability to bring value to our physicians, hospital partners and shareholders through our service offerings and our investments in clinical research, education and quality.

11

30. With respect to the Company's 2016 first-quarter outlook, MEDNAX said that it "expects earnings per share will be in a range of $0.72 to $0.76 per diluted share and Adjusted EPS will be in a range of $0.85 to $0.89."

31. Also on February 4, 2016, MEDNAX held a conference call with analysts and investors to discuss its earnings for the fourth quarter of 2015 and its acquisition program. During the call, Defendant Medel emphasized the importance of the Company's acquisition program, noting that the Company expended over $850 million of capital to "grow through acquisitions in 2015, by far the largest amount we've ever used for growth in any one year." In describing MEDNAX as a preferred partner for anesthesiologists, he boasted that:

> [O]ver the last three years, 21 private practices have joined MEDNAX. In fact, over that time period, more practices have chosen to join MEDNAX than any other organization. I believe our commitment to quality, patient care, and dollar investments to support our physicians play a real and important role in these decisions. And ***based on our pipeline, I believe that we will continue to be one of the most active acquire[r]s in this specialty at reasonable rates.***"

32. Medel further stated, "[w]e do have a very full pipeline, a number of good anesthesiology deals in our pipeline at multiples that we consider to be reasonable. And so, we expect that we will continue to execute during this year independently of this other factor, which I think over time should help more deals get done at reasonable multiples."

33. In fact, Medel explained that since the acquisition of Virtual Radiologic Corporation the year prior, "we've gotten a number of indications from radiology practices that they are interested in talking about joining us."

34. Finally, Defendant Medel concluded that "[o]ur pipeline is very full. We do have a number of deals under [letters of intent] and so we are happy with our position. . . . So we've got plenty of financial power to continue to execute on our strategy."

. . .

**B. February 11, 2016**

36. On February 11, 2016, MEDNAX filed with the SEC its annual report on Form 10-K for the year ended December 31, 2015 ("2015 10-K"). Under the heading "Our Business Strategy," the Company stated in the 2015 10-K:

> We continue to seek to expand our operations by acquiring established physician practices in our specialties which include neonatology, anesthesiology, maternal-fetal medicine and pediatric cardiology. We also pursue complementary pediatric subspecialty physician groups, such as pediatric intensivists, pediatric hospitalists and pediatric surgeons. . . . During 2015, we added 10 physician groups to our national network

through acquisitions consisting of seven anesthesiology practices, two neonatology practices and one other pediatric subspecialty practice.

37. With respect to acquiring complementary service businesses, the Company added:

> In addition to our national physician practice network, during 2015 we added a radiology physician services and telemedicine company that provides radiology coverage to over 2,100 healthcare companies across all 50 states, the District of Columbia and Puerto Rico and a third-party receivables company that specializes in third-party revenue recovery on accounts that require heightened expertise, labor and capital and which provides services to over 260 hospitals nationwide. We expect that the development of our service offerings will function as support for our own physician practices as well as a revenue generating outsourced service capability. We will pursue additional opportunities in order to expand our service offerings to address the evolving needs of our hospital partners and other customers.

38. The Company further touted its business model in the 2015 10-K, stating that "we believe that *physicians remain receptive to being affiliated with larger organizations that reduce administrative burdens, achieve economies of scale and provide value-added clinical research, education and quality initiatives*.

. . .

### C. April 28, 2016

40. On April 28, 2016, the Company filed its quarterly report on Form 10-Q for the first quarter of 2016, ended March 31, 2016. The Company reported therein net income of $67.899 million. Net revenue increased $113.2 million, or 17.7%, to $752.6 million for first quarter, as compared to $639.4 million for the same period in 2015. Importantly, "[o]f this $113.2 million increase, $96.5 million, or 85.2%, was attributable to revenue generated from acquisitions completed after December 31, 2014."

41. In a press release also issued that day, Defendant Medel punctuated the extent to which the Company's growth was driven by acquisitions, boasting that "MEDNAX's revenue growth attributable to recent acquisitions was 15.1 percent, while overall same-unit revenue increased by 2.6 percent when compared to the prior year period." The Company reported that it used approximately $60 million during the first quarter of 2016 to fund acquisitions and to make contingent purchase price payments for previously completed acquisitions. Medel added, "[o]ur first-quarter results marked a strong start to the year and a continuation of our growth and operating strategy . . . . We generated double-digit growth in revenue and EBITDA, which reflected the increasingly diversified ways in which we can add value to our hospital partners."

42. Later on the same day, the Company held a conference call with analysts and investors to discuss MEDNAX's first quarter 2016 earnings, and

specifically the Company's acquisition program. At the onset of the earnings call, Defendant Medel touted the completion of "four practice acquisitions that we've continued to add to our pipeline of signed letters of intent ['LOIs']." Medel continued, "Looking at that pipeline and other discussions we're having, I am confident that we will have another very active year in 2016 as we were to use our capital for acquisitions across all of our specialties and business lines."

43. Defendant Lopez-Blanco reiterated during the call that the Company's net revenue increased by 18% to $753 million, and that 85% of the growth came from recent acquisitions. She further stated that the Company was expecting earnings for the next quarter to be in the range of

44. In response to an analyst question during the call, Defendant Medel underscored that "there are plenty of opportunities for growth" for the Company, with "a dozen LOIs in our pipeline" for anesthesia practices and "basically all of the specialties that we're in." He claimed that "we're not having any trouble getting these deals sourced and getting LOIs in place. And I believe we'll close most of these deals." Further to that point, Medel said, "the opportunity that we see is that now we have more areas of growth than we have ever had in the past," which historically consisted of "neonatology and anesthesia" but was expanding to "management services" and "telemedicine." Medel summarized that "there's a number of additional opportunities for growth, and so we're pretty comfortable that we're going to have a pretty good year and continue to grow." In regard to radiology, Medel stated that "we are talking to a number of radiology practices," and that "[w]e believe that we will have our first hospital-based radiology group onboard before the end of the year and there is a lot of practices that are interested in talking to us, and we think that that will add yet another potential avenue of growth for us."

45. Defendant Medel also specifically rebuffed an analyst who stated that it "sounded to me a little bit like we should expect to see more non-NICU, non-anesthesia deals going forward." Medel rejoined, "No, I wouldn't say that at all. We've got a bunch of deals that are anesthesia and pediatrics-related in our pipeline. There may be one or two, probably one deal, in the pipeline that's related to management services. But the bulk definitely of what we're looking at with the LOIs that we have in the pipeline are all clinical."

. . .

### D. June 7, 2016

47. On June 7, 2016, at the Jeffries Healthcare Conference, Defendant Lopez-Blanco continued the Company's campaign of touting MEDNAX's acquisition pipeline, stating: "Our pipeline is very robust at this time . . . there will be more to come because we do have plenty in the pipeline, as well as even with these acquisition activities, we have roughly . . . two times leverage ratio. And so again, there's a lot of room to grow." She also represented that MEDNAX's pipeline is "more robust than ever, and it has to do with the fact that physicians, if they want a long-term stable environment, know that that's one that MEDNAX can provide."

. . .

**E. June 14, 2016**

49. The next week during the William Blair Growth Stock Conference held on June 14, 2016, Defendant Medel assured attendees that MEDNAX had "successfully completed over 220 practice acquisitions since we went public in 1995 . . . . [A]nd I can tell you *I don't have a single practice that wants to undo their deal,* get their practice back or break away from MEDNAX."

. . .

**F. July 28, 2016**

51. On July 28, 2016, the Company filed its Form 10-Q for the second quarter of 2016, ended July 28, 2016. In its report, the Company announced net income of $82.4 million. Net revenue increased $95.2 million, or 14.1%, to $771.8 million for the second quarter, as compared to $676.6 million for the same period in 2015. The Company noted that "[o]f this $95.2 million increase, $81.9 million, or 86.1%, was attributable to revenue generated from acquisitions completed after March 31, 2015." In the Company's concurrent press release, Defendant Medel stated that "[o]ur second-quarter results demonstrated continued progress in our growth and operating strategy. . . ."

52. During the conference call held that day with analysts and investors, Defendant Medel asserted that "[i]n anesthesiology, we've acquired four practices so far this year, and our pipeline continues to grow." According to Medel, "[a]nesthesiology groups increasingly see the need to be a part of a larger organization that can support them and invest in the data and technology capabilities that their hospital partners are asking of them." He elaborated that "we see the opportunities to continue to grow our footprint as significant, and I anticipate that we will have additional acquisitions to discuss with you in the near future. . . . So all in all, *our practice acquisition pipeline remains very robust*, and we're on track to have a very busy year in 2016." Defendant Medel concluded his prepared remarks by boasting, "We've got a great practice acquisition pipeline. We've been closing deals. We've got strategic growth in our MSO services, and we've got the financial strength to continue to pursue growth."

53. Later during the call, Defendant Medel refuted the suggestion that modest growth from acquisitions was due to a lengthening of transaction closing times or competition:

> I would say, [those trends were salient] no more than in the past. We still have a full pipeline, and we still think that we are going to do a number of acquisitions this year. As I said in my remarks, I do expect that we will be doing more anesthesia deals. And we expect some in the not too distant future. And I also expect that we will acquire our first radiology – on-site radiology practice this year, which has been our plan all along.
> So I would say no. I think that we are right on track. Some of the timing can be off a little bit for whatever reasons. People go on vacation. We had a deal we thought we were going to close a couple of weeks ago when somebody went on vacation. We'll get it closed, but the point is that it's – that's *just an overflow of deals*.

15

54. When the same analyst noted that the anesthesia "market had been pretty hot" and asked if MEDNAX was experiencing moderation in that specific market, Medel flatly responded,

"I wouldn't say that it has moderated." Nevertheless, in an early hint that the market was in fact slowing, Medel stated that "the practices that . . . people were willing to pay a premium for are probably not as many as before," resulting in "multiples com[ing] down a little bit." Medel added that "that's based mostly on the type of practices that are out there, not the big central long-term established kind of practices. When they come on, they are still getting those higher multiples."

. . .

### G. September 7, 2016

56. Then, on September 7, 2016, during the Robert W. Baird Global Healthcare Conference, Defendant Lynch discussed the Company's history of acquisitions and its pipeline for new acquisitions. Specifically, Defendant Lynch noted that MEDNAX had "completed over 10 practice acquisitions so far this year" and claimed that it had "an excess of that today under signed letters of intent for future acquisition." According to Lynch, "[e]ach step of the way through this year as we've completed acquisitions, we've been successful at adding more to the pipeline and a lot of that has been in anesthesia." Thus, "we have been able to increase our physician base in anesthesiology by well north of 20% each year."

57. Defendant Lynch added that to-date in 2016, MEDNAX had "added about 15% to that physician base," and had "a path and a visibility to exceeding that 20% level again, against an ever-increasing physician base." Lynch suggested that the increased physician base was due to the "***receptivity of independent anesthesia practices, to thinking about joining a larger organization***," which he claimed "***continues to grow and become more ubiquitous***." He concluded, "Whatever the case may be, the activity in that specialty continues to accelerate in terms of consolidation. So, we feel that our ability to put our capital to work to add to our physician base through practice acquisitions is as strong as it's ever been."

. . .

### H. October 27, 2016

59. On October 27, 2016, the Company filed its Form 10-Q for the quarter ended September 30, 2016. In that report, the Company announced net income of $96.505 million. Net revenue increased $105.7 million, or 14.6%, to $828.0 million for the third quarter, as compared to $722.3 million for the same period in 2015. The Company also noted that "[o]f this $105.7 million, $95.5 million, or 13.2%, was attributable to revenue generated from acquisitions completed after June 30, 2016."

60. In the Company's press release issued that same day, Defendant Medel stated that "[o]ur third-quarter results reflected the ongoing development of our growth and operating strategy" as the Company "acquired five physician practices during the quarter." Medel continued, "Looking forward, we believe we are well

16

positioned, strategically and financially, to continue to grow and provide broad-based health solutions to our partners[.]"

61. Also on the same day, during a conference call with investors and analysts to discuss MEDNAX's earnings for the third quarter of 2016, Defendant Medel boasted that "2016 continues to be one of our busiest years ever for acquisitions." He stated that during the third quarter, MEDNAX "acquired five practices for a total of 12 practice acquisitions for the year-to-date," including three anesthesia practices during the quarter and eight for the year. Those acquisitions resulted in a 20% increase in the Company's physician population for anesthesia during the first three quarters of the year, and Medel claimed that the "pipeline remains strong and I am confident we can close additional anesthesia practice acquisitions this year."

62. When asked if the Company would consider a stock repurchase, Defendant Medel stated that MEDNAX would rather use that money for acquisitions. He explained that "given our full pipeline . . . we would rather put our money to work by acquiring practices," and he claimed that MEDNAX had received a "particularly encourag[ing]" reception from radiology practices that Company representatives had met in connection with further potential acquisitions.

63. Defendant Medel added during the call that MEDNAX's "strong financial position" was "particularly important given the strength of our practice acquisition pipeline as we look forward." Medel confirmed that MEDNAX had "significant opportunities to put this capital to work in practice acquisition" and that he expected that MEDNAX "will continue to be very busy on that front as we wrap up this year and look into 2017."

. . .

**I. November 15, 2016**

65. On November 15, 2016, during the Stifel Healthcare Conference, Defendant Lynch touted MEDNAX's growth through acquisitions, "particularly in anesthesiology," stating that "over the course of the last four or five years, we've not only driven revenue growth that's been generally in the teens through organic growth and through acquisitions, but we've also diversified our revenue sources across different specialties. And you can see some of the wedges growing there, particularly in anesthesiology, as that's been our largest area of activity for acquisitions." Also during this conference, Lynch underscored MEDNAX's apparent ability to grow through further anesthesiology acquisitions, asserting that "our more recent entry into anesthesiology gives us significantly greater population of physicians that we can talk to about joining MEDNAX." Lynch concluded by stating that MEDNAX does "see a very active pipeline of practice acquisitions that we continue to go after."

. . .

**J. December 7, 2016**

67. At the Citi Global Healthcare Conference held on December 7, 2016, Defendant Medel again misleadingly touted the Company's "pretty full pipeline for anesthesia," stating:

17

"[I]n fact we've acquired more anesthesiology practices over the last 3 years than any one of our competitors. If it's just about money and you're looking to make 11, 12, 13 times multiple on your practice, we're not going to be the winners. On the other hand, if you want to join a group of your own peers and you're not going to get flipped in 3 or 4 years and you want to have opportunities to do research and medical education, if your hospital has to approve the sale, we have lots of great relationships with hospitals, etc. So anyway, we have a pretty full pipeline for anesthesia."

[DE 53] at ¶¶ 29-34; 36-38; 40-45; 47; 49; 51-54; 56-57; 59-63; 65; 67 (emphasis in First Amended Complaint).

The First Amended Complaint alleges that each of the statements set forth *supra* were materially false and misleading for the following boilerplate reasons:

(a) MEDNAX's strategy of growing revenue by acquiring new anesthesiology practices was not sustainable;

(b) MEDNAX was experiencing a shift toward lower-margin government and self-pay payors, as well as growth in compensation expense for nurse anesthetists, which together were affecting the profitability of acquired anesthesiology practices and the valuations of practices that the Company was considering purchasing;

(c) the changing economics of MEDNAX's acquired anesthesiology practices were undermining the Company's ability to turn profits on those practices, and was forcing the Company to re-examine whether it should continue acquiring anesthesiology practices;

(d) in order to continue acquiring anesthesiology practices in a sufficiently profitable manner, MEDNAX would need to purchase those practices at lower prices than it had done so previously, but physicians who had sold practices were often already dissatisfied with the price and salary terms of the acquisitions, making it infeasible for MEDNAX to lower purchase prices any further and thus impossible for MEDNAX to continue acquiring new anesthesiology practices at sufficiently profitable prices;

(e) MEDNAX's relationships with the anesthesiologists it employed and its reputation among anesthesiologists in practices not acquired by MEDNAX were deteriorating to the point that it was difficult for the Company to attract and retain anesthesiologists to fulfill the Company's contracts with hospitals; and

(f) due to the failing economics of new practice acquisitions and anesthesiologists' lack of desire to become affiliated with MEDNAX, the market for new acquisitions was contracting and the Company was growing increasingly unable to find new anesthesiology practices to purchase.

*See* [DE 53] at ¶¶ 35, 39, 46, 48, 50, 55, 58, 64, 66, 68.

18

### b.  The 2017 Materially False and Misleading Statements

The First Amended Complaint alleges that Defendants made false and misleading statements and material omissions in 2017 on the following seven (7) dates: February 7, 2017; February 10, 2017; April 20, 2017; May 4, 2017; May 23, 2017; June 6, 2017; and June 13, 2017. *See* [DE 53] at ¶¶ 69-71; 73-75; 77-79; 81-88; 90; 92-95; 97.  The 2017 statements are set forth below:

> **K. February 7, 2017**
>
> 69. On February 7, 2017, the Company issued a press release reporting net income of $78.079 million for the fourth quarter. Net revenue for the quarter increased by 12 percent, to $830.8 million, from $741.7 million for the prior-year period, which was "driven primarily by contributions from acquisitions completed since October 2015." The press release also noted that "revenue growth attributable to recent acquisitions was 11.3 percent, while overall same-unit revenue increased by 0.7 percent when compared to the prior year period." During the fourth quarter, the Company used approximately $40.2 million to fund acquisitions and to make contingent purchase price payments for previously completed acquisitions. Medel stated in the press release that MEDNAX continued to enjoy a "robust acquisition pipeline," which he claimed was reflected in the results issued that day.
>
> 70. That same day, the Company held an analyst conference call to discuss fourth-quarter 2016 earnings. During the call, Defendant Medel cautioned that it is "always difficult to pinpoint" the timing of acquisitions, which can "impact our growth at least in the short-term," but nevertheless he sought to assure investors that "we continue to add to our acquisition pipelines[.]" Discussing anesthesiology acquisitions, Medel claimed that "this has been a very stable business" and reiterated that the "acquisition market remains very active, and *based on our pipeline, I expect that 2017 will be just as busy*." Medel also stated that changes in physician reimbursement would have a positive impact on the business: "We're also well prepared for the changes in reimbursement that will affect anesthesiologists under the macro legislation. . . . [W]e believe the changes in payments under macro can have a positive impact for us."
>
> 71. Defendant Medel concluded his prepared remarks by emphasizing the purported benefits of MEDNAX's acquisition strategy:
>
>> Finally, we had a tremendously active year in 2016 utilizing over $760 million of capital to acquire 13 practices and two [management services organization] companies. And in the process, exceeded $3 billion in annual revenue for the first time. Despite this, we enter the year in a strong financial position with modest leverage and more than $900 million available on our line of credits as of year-end. *Given the opportunities we*

19

*see for acquisitions today across all of our specialties, I anticipate that we will have another very busy year in 2017 putting our capital to work*.

. . .

### L. February 10, 2017

73. On February 10, 2017, MEDNAX filed with the SEC its annual report on Form 10-K for the year ended December 31, 2016. The Company detailed in its annual report that net revenue increased $403.2 million, or 14.5%, to $3.18 billion for the year ended December 31, 2016, as compared to $2.78 billion for the prior year. Of this $403.2 million increase, $356.4 million, or 12.7% was attributable to revenue generated from acquisitions completed after December 31, 2014. The Company noted that during the 2016 fiscal year, net cash used in investing activities was $821.2 million which included acquisition payments of $762.3 million relating to the purchase of 13 physician practices and two complementary services businesses, capital expenditures of $39.3 million, and net purchases of investments of $19.6 million.

74. In discussing its acquisition model, MEDNAX stated in its annual report that "we continue to seek to expand our operations by acquiring established physician practices in our specialties which include neonatology, anesthesiology, maternal-fetal medicine and pediatric cardiology. We also pursue complementary pediatric subspecialty physician groups, such as pediatric intensivists, pediatric hospitalists, pediatric surgeons, pediatric ear, nose and throat physicians and pediatric ophthalmologists." The Company represented that it "can improve the results," including revenue for all of its acquired physician practices, "through improved managed care contracting, improved collections, identification of growth initiatives, as well as, operating and cost savings based upon the significant infrastructure that we have developed."

75. Finally, which respect to its approach in dealing with its affiliated physicians, MEDNAX asserted that its "business model, which has been influenced by the direct contact and daily interaction that our affiliated physicians have with their patients, emphasizes a patient-focused clinical approach that addresses the needs of our various 'partners', including hospitals, third-party payors, referring and collaborating physicians, affiliated physicians and, most importantly, our patients."

. . .

### M. April 20, 2017

77. On April 20, 2017, MEDNAX issued a press release previewing its 2017 first-quarter results. the Company announced in the release that results for the quarter were lower than the results in the prior year quarter across many key financial metrics:

- Net revenue of $836 million, compared to $753 million in the prior year quarter;
- Net income of $55 million, compared to $68 million in the prior year quarter;
- EBITDA of $132 million, compared to $144 million in the prior year quarter;

20

- Earnings per share of $0.59, compared to $0.73 in the prior year quarter; and
- Adjusted EPS of $0.75, compared to $0.87 in the prior year quarter.

78. The Company attributed the poor results to a handful of adverse trends. First, the Company disclosed that same-unit revenue was undermined by a "90 basis point payor mix shift to government payors," which had a 150 basis point negative effect on same-unit pricing. With respect to anesthesiology services, the effect was even more pronounced: "on a same-unit basis, payor mix for anesthesiology services [was] expected to shift by 190 basis points to government payors compared to the prior year period[.]" Second, the Company experienced a 2.1% decline in neonatal intensive care unit patient days from the prior year quarter, which caused a 60 basis point decline in same-unit volumes. Third, the Company revealed that "higher than expected practice salaries and benefits expense, primarily for non-physician clinicians, is expected to impact the Company's Adjusted EPS unfavorably by $0.02 from what was anticipated within MEDNAX's previously reported first-quarter outlook."

79. As a result of this announcement, the price of MEDNAX stock declined $5.39 per share, or more than 8%, from a close of $66.69 per share on April 19, 2017, to close at $61.30 per share on April 20, 2017. That drop was accompanied by unusually high trading volumes, with more than 6 million shares traded during the day. Indeed, analysts expressed disappointment in the results. JPMorgan observed in a report that the Company had a "sizable" miss on both guidance and consensus estimates for many financial metrics, and noted that the Company was "not responding to analyst inquiries" for further explanation beyond the contents of the press release issued that day. SunTrust Robinson Humphrey referred to the preannouncement as "disappointing" and cut its price target from $72 per share to $65 per share. Stephens also set its price target to $65 per share on the "disappointing" results.

. . .

**N. May 4, 2017**

81. On May 4, 2017, the Company filed its Form 10-Q for the quarter ended March 31, 2017, confirming the weak financial results pre-released on April 20, 2017. The Company held an analyst conference call that morning, during which Defendants provided additional detail for the declining performance. On the call, Defendant Medel acknowledged that the Company was seeing "faster inflation in compensation expense for nurse anesthetists which impacted our labor costs," that "same unit revenues in both anesthesia and neonatology were challenged" in the quarter, and that payor mix trends would likely continue to negatively affect results. Medel nevertheless reassured investors that the Company had "identified new growth opportunities that we're acting on," particularly in radiology and management services. Medel claimed to be "committed and optimistic" about the Company's future and said that MEDNAX was "focused on the opportunities in front of us to innovate, to lead in our clinical field, and to grow and succeed in the years to come."

21

82. During the question and answer portion of the call, Defendant Medel expounded upon the higher compensation expenses, revealing that it was related to higher compensation for nurse anesthetists. He explained that certain practices had "figured out that they need to hire nurse anesthetists in order to be more productive or efficient," and had begun recruiting nurse anesthetists. Medel stated that nurse anesthetists were being "offered more dollars to go work with other practices in the area," with certain nurse anesthetists "being offered $200,000 [per] year salaries, which is a significant upgrade."

83. Defendant Medel also provided further detail on the current state of potential radiology acquisitions:

We do think that our radiology opportunity is very attractive. I am very bullish on it. I think we have a significant competitive advantage with radiology that no one else has. And I do expect that we will make more acquisitions this year on-the-ground radiology practices before the year is over. All of that seems to be trending in the right direction.

84. In response to a comment by an analyst concerning "a slowdown in deal flow," Defendant Medel stated that investors should expect "one or two anesthesia acquisitions" and "as many as three or four radiology practice acquisitions" during the year. Medel stated that it would not be unreasonable "to think that we could put $1 billion to work during the remainder of the year. But again, things have to fall in place and we've got to get that done."

85. Despite those bullish statements, Medel remarkably admitted during the call that he did not "have a clue really" how the Company would perform in the coming months in regard to volumes and payor mix. In that vein, Medel conceded that he had "no crew to tell me that things are getting worse, that the volume's getting worse, that the payer mix is getting worse[.] I don't why the payer mix did what it did, and I certainly was not expecting volumes in the neonatal ICU to drop," and bluntly stated that he did not "want to have this conversation with you guys anymore."

86. On this news, the price of MEDNAX stock declined $4.38 per share, or more than 7%, from a close of $60.43 per share on May 3, 2017, to close at $56.05 per share on May 4, 2017 on an unusually high volume of more than 3 million shares traded.

87. Financial analysts reacted negatively to the disclosures made by Defendants that day. Bank of America downgraded MEDNAX stock to "underperform" and cut its price target from $75 per share to only $57 per share, noting that the Company's earnings guidance was below analyst estimates. JPMorgan similarly cut its price target from $69 per share to $55 per share, noting that "operational execution has suffered." However, JPMorgan continued to believe the Company's false assurances regarding acquisitions, and stated that MEDNAX is "positioned to build national practices in anesthesia and radiology by consolidating these physician specialties," and "growth of anesthesia and

22

radiology services should position [MEDNAX] more favorably . . . for faster growth in non-hospital ancillary sites of care." Stephens also remained "hopeful" that the announcement was the low point for the Company, despite the suggestion from the Company's quarterly guidance that "it could get worse before it gets better."

88. Gordon Haskett Research Advisors ("Gordon Haskett") commented on Defendant Medel's "defeatism" on guidance, observing that Medel "threw in the towel" and appeared to be "at his wits end." Wells Fargo Securities also observed that the Company "had little visibility into its results, and appeared to be somewhat frustrated by that and questions regarding future trends."

. . .

**O. May 23, 2017**

90. Similarly, during the UBS Global Healthcare Conference held on May 23, 2017, Defendant Lynch stated that MEDNAX anticipated that it would see "continued growth . . . in anesthesiology through acquisitions."

. . .

**P. June 6, 2017**

92. During the Jefferies Global Health Care Conference held on June 6, 2017, Defendant Lopez-Blanco responded to a question about the "pace of deals," which was tracking below the projected $1 billion in spending for the year. Specifically, Lopez-Blanco stated that spending "will be heavily weighted in the area of radiology" and discounted the possibility that the Company would use that capital to repurchase shares because shareholders were "really going to be much happier in the long term if we . . . deploy it to buy physician practices."

93. Defendant Lopez-Blanco also cast doubt on the suggestion that new acquisitions were more scarce, and instead attributed the apparent slowdown to the difficulty of predicting the timing of new deal closures and the need to conduct due diligence:

> And so, why has it slowed down? I've said to you guys for a number of years now, it's timing of the deal that's very hard to predict, and one of the things that MEDNAX is not going to do is to deviate from the due diligence process that it has, which is quite robust because we want to make sure that we have those physicians' credential, and day one, we can bill for their services, we've looked at their malpractice experience, we've looked at their payer contracts, and so all of that takes time.

94. Defendant Lopez-Blanco sought to assuage concerns that the Company was not pursuing anesthesiology deals, stating that "you'll continue to see us deploying some capital in anesthesia," thought she cautioned that "you have to be somewhat disciplined on those multiples, given some of the macro dynamics on the reimbursement side in the anesthesiology space right now." She couched the Company's reasoning in terms of a desire to please shareholders, who "would want us to be prudent on deployment of capital at a reasonable price for continuing to build out some of the anesthesia space."

23

95. Finally, in her "parting words for investors', Defendant Lopez-Blanco stated that MEDNAX remained "very excited about the opportunities that we see ahead of us . . . in the competitive advantage that we believe we have in building out this radiology platform. So with that, we're all pretty much focused on that." . . .

**Q. June 13, 2017**

97. On June 13, 2017, while at the William Blair Growth Stock Conference, Defendant Lopez-Blanco touted MEDNAX's growth in anesthesiology, calling the business "an opportunity and a growth vehicle," additionally stating that "there's 51,000-or-so board certified anesthesiologists, of which roughly we employ 1,400-or-so" and thus "***there's a lot of room to grow***" in anesthesiology.

[DE 53] at ¶¶ 69-71; 73-75; 77-79; 81-88; 90; 92-95; 97 (emphasis in First Amended Complaint).

The First Amended Complaint alleges that each of the 2017 statements set forth *supra* were materially false and misleading for the same set of boilerplate reasons as the 2016 statements:

(a) MEDNAX's strategy of growing revenue by acquiring new anesthesiology practices was not sustainable;

(b) MEDNAX was experiencing a shift toward lower-margin government and self-pay payors, as well as growth in compensation expense for nurse anesthetists, which together were affecting the profitability of acquired anesthesiology practices and the valuations of practices that the Company was considering purchasing;

(c) the changing economics of MEDNAX's acquired anesthesiology practices were undermining the Company's ability to turn profits on those practices, and was forcing the Company to re-examine whether it should continue acquiring anesthesiology practices;

(d) in order to continue acquiring anesthesiology practices in a sufficiently profitable manner, MEDNAX would need to purchase those practices at lower prices than it had done so previously, but physicians who had sold practices were often already dissatisfied with the price and salary terms of the acquisitions, making it infeasible for MEDNAX to lower purchase prices any further and thus impossible for MEDNAX to continue acquiring new anesthesiology practices at sufficiently profitable prices;

(e) MEDNAX's relationships with the anesthesiologists it employed and its reputation among anesthesiologists in practices not acquired by MEDNAX were deteriorating to the point that it was difficult for the Company to attract and retain anesthesiologists to fulfill the Company's contracts with hospitals; and

(f) due to the failing economics of new practice acquisitions and anesthesiologists' lack of desire to become affiliated with MEDNAX, the market

24

for new acquisitions was contracting and the Company was growing increasingly unable to find new anesthesiology practices to purchase.

*See* [DE 53] at ¶¶ 72, 76, 80, 89, 91, 96, 98.

### c. Analysis

Defendants argue that the Court should dismiss the First Amended Complaint for failure to plead sufficient facts under the relevant pleading standards to establish: (1) material misrepresentation or omission; and (2) a strong inference of scienter. The Court will address each of these elements of a securities fraud claim in turn. Determining that Count I fails as to both of these required elements, the Court will dismiss Count I for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants. Based upon the disposition of Count I, the Court will also dismiss Count II for violations of Section 20(a) of the Exchange Act against the Individual Defendants.

### 1. Material misrepresentation or omission

The first element necessary to state a claim for securities fraud under Section 10(b) of the Act and Rule 10b–5 is a material misrepresentation or omission. *Instituto De Prevision Militar*, 546 F.3d at 1352.

Plaintiff's position in this action is that each of the alleged false and misleading statements made by Medel, Lopez-Blanco and Lynch misled investors because each statement omitted material facts that go the basis of the statement that would have altered the total mix of information available to the investor if revealed. "A statement is misleading if in light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 863 (2d Cir. 1968)) (alterations and ellipsis omitted). Plaintiff relies on *FindWhat* for the proposition that by voluntarily revealing one fact about its operations, a duty arises for a corporation to disclose such

other facts, if any, as are necessary to ensure that what was revealed is not "so incomplete as to mislead." *FindWhat Investor Group*, 658 F.3d at 1305. *See also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) ("[T]his materiality requirement is satisfied when there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"). Thus, Plaintiff avers that all statements the Defendants made that there was a strong pipeline for new acquisitions and that the Company had room to grow were materially false and misleading because when each statement was made Defendants had a duty to disclose the adverse trends that would plague MEDNAX's business model, and their failure to do so rendered the statement materially false and misleading.

Defendants, in contrast, argue that the the statements at issue are not actionable as a matter of law because (i) they are statements of corporate optimism and puffery; (ii) they also are forward-looking statements protected by the PSLRA's safe harbor; and (iii) Plaintiff has failed to plead facts showing that any of the statements was false.

*i.    Statements of corporate optimism and puffery*

"[G]eneralized, non-verifiable, vaguely optimistic statements . . . constitute non-actionable puffery." *In re: Altisource Portfolio Sols., S.A. Sec. Litig.*, No. 14-cv-81156-WPD, 2015 WL 12001262, at *10 (S.D. Fla. Sept. 4, 2015); *see also City of St. Clair Shores Police v. Nationstar Mortg. Holdings Inc.*, No. 15-cv-61170-WPD, 2016 WL 4705718, at *12 n.7 (S.D. Fla. June 21, 2016) ("Statements of corporate optimism . . . [are] considered inactionable puffery."). Statements that "are expressly based on the opinions, 'feel[ings], belie[fs], hope[s], and want[s] of management—cannot give rise to a securities fraud claim.'" *Angelini v. Gonzalez*, No. 16-cv-21290, 2017 WL 10242455, at *3 (S.D. Fla. June 8, 2017) (quoting *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1211 (M.D. Fla. 2014)). The Court agrees with Defendants

26

that the First Amended Complaint impermissibly grounds its securities fraud claim on numerous inactionable statements of corporate optimism expressing Defendants' subjective beliefs in MEDNAX's "strong position" in the anesthesiology practice acquisition market, "robust pipeline" of deals, and "continued growth," *See, e.g.,* [DE 53] at ¶¶ 4, 6, 29, 41, 47, 51, 52, 60, 61, 63, 65, 69, 71. These and other similar statements relied on by Plaintiff are indistinguishable from those which courts routinely hold to be inactionable puffery. *See Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1027–28 (11th Cir. 2003) (holding that the statement, "as our Company's strong performance continues," to be non-actionable puffery, which, as a matter of law, would not induce reliance); *Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1192-96 (S.D. Fla. 2015), *aff'd sub nom. IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850 (11th Cir. 2016) (Defendant's statements about the company's "positioning capabilities," its "robust 'sales force'" and that the company's "approach provides 'significant competitive advantage'" are the type of corporate puffery that is not actionable.); *Thorpe v. Walter Inv. Mgmt., Corp.*, No. 1:14-CV-20880-UU, 2014 WL 11961964, at *12 (S.D. Fla. Dec. 23, 2014) (holding several alleged misrepresentations "amount to no more than inactionable corporate puffery," including the statements: "Based on our continued track record of performance, as well as the significant amount of new business opportunity in the market and in our pipeline, we expect to see continued strong performance and results in the second half of this year;" and "Based on our continued track record of performance, as well as the significant amount of new business opportunity in the market and in our pipeline, we expect to see continued strong performance and results in the second half of this year."); *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1212–13 (M.D. Fla. 2014) (holding that several allegedly false and misleading statements were inactionable corporate puffery, including statements: "Our third-quarter financial results reflect continued strength in our business.... [W]e have operational

27

initiatives underway that we believe will enhance our ability to achieve our long-term growth objectives;" "We believe that our overall sales results continue to validate our future growth potential;" and "[We] ... remain confident in our long-term growth outlook."); *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1238–39 (M.D. Fla. 2002) (holding that statements by a company that an acquisition "continues" the company's "dynamic growth" and "adds enhanced value" are inactionable puffery).

Plaintiff fails to adequately distinguish Defendants' statements pled in the First Amended Complaint from those routinely found to be inactionable general corporate optimism and puffery. Further, Plaintiff's justification that the statements are nonetheless actionable because the Defendants each actually knew the statements were false as they made them fails because the First Amended Complaint fails to allege specific factual allegations sufficient to demonstrate that the Defendants' statements were false, *e.g.*, that on June 7, 2016 there were not plenty of deals in the pipeline and that Defendant Lopez-Blanco knew that there were not plenty of deals in the pipeline on June 7, 2016 (*see* [DE 53] at ¶ 47), much less that the Defendants had the requisite scienter of the statement's falsity. *See infra.* Plaintiff's circular argument fails. The statements at issue are not actionable as a matter of law.

### ii.   *PSLRA's safe harbor provision*

Next, Defendant argues that the alleged misrepresentations at issue are forward-looking statements protected by the PSLRA's safe harbor provision. The PSLRA "provides a safe harbor from liability for certain 'forward-looking statements.'" *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999) (citing 15 U.S.C. § 78u–5(c)(1)). Under this safe harbor provision, "corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'"

28

*Id.* (quoting 15 U.S.C. § 78u5(c)(1)(A)(i)). Additionally, even should no cautionary language accompany the forward-looking statement, a plaintiff must prove that the defendant made the statement with "actual knowledge" that the statement was "false or misleading." *Id.* Where meaningful cautionary language accompanies a statement, however, the court need proceed no further because the defendant's state of mind is then irrelevant. *Id.* at 804–05.

The PSLRA defines forward-looking statement as follows:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5.

Forward-looking statements combined with historical or present facts are also protected by the PSLRA's safe harbor:

In *Harris*, the Eleventh Circuit held that "when the factors underlying a projection or economic forecast include both assumptions and statements of known fact, and a plaintiff alleges that a material factor is missing, the entire list of factors is treated as a forward looking statement." *Harris*, 182 F.3d at 807. Defendants' statements have a forward looking basis (e.g., "maximiz[ing] future revenue growth") combined with historical or present facts. Such statements are thus protected.

*In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1280 (S.D. Fla. 2017). "Even statements that include both forward-looking and non-forward-looking factors must be treated as forward-looking." *In re Columbia Labs., Inc. Sec. Litig.*, 144 F. Supp. 2d 1362, 1368 (S.D. Fla. 2001).

Defendants contend that the alleged misrepresentations at issue are all forward-looking statements because they either opine as to the future economic performance of MEDNAX or they state the underlying assumptions relating to such opinions. *See, e.g.*, [DE 53] at ¶ 42 (During an April 28, 2016 conference call with analysts and investors to discuss MEDNAX's first quarter 2016 earnings, and specifically the Company's acquisition program, Medel stated "Looking at that pipeline and other discussions we're having, I am confident that we will have another very active year in 2016 as we were to use our capital for acquisitions across all of our specialties and business lines."). The Court agrees with Defendants that challenged statements set forth in ¶¶ 29, 31, 37, 42 ,52, 53, 60, 63 70, 71, 81, 83, 84, 90, 97, and 103 of the First Amended Complaint are forward-looking because they "reflect Defendants' optimism and expectations about a future event." *See In re Columbia Labs.*, 144 F. Supp. 2d at 1368.

In addition, the Court finds that the forward-looking statements were accompanied by the requisite meaningful cautionary language[2] which was not merely boilerplate blanket language and, moreover, the Court in determines that the cautionary language was "of a similar significance to the risks actually realized." *See Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001); *Harris*, 182 F.3d at 807. Accordingly, "scienter is irrelevant to this safe harbor." *Harris*, 182 F.3d at 803. Notwithstanding, even if the statements were not accompanied by the meaningful cautionary language, the safe harbor provision would still apply to the forward looking statements identified because the First Amended Complaint fails to sufficiently allege facts showing that the statements are false or misleading, *see infra,* and fails to plead facts raising a strong inference of scienter, *see infra.*

---

[2] *See* [DE 62] at Ex. 3 at 2; Ex. 4 at 2; Ex. 5 at 18; Ex. 7 at 2; Ex. 8 at 19; Ex. 10 at 2; Ex. 11 at 20; Ex. 13 at 2; Ex. 15 at 2; Ex. 16 at 2; Ex. 18 at 18; Ex. 19 at 2; Ex. 20 at 20; Ex. 22 at 2; and Ex. 23 at 2.

> ### iii. *Failure to plead facts showing the statements were false or misleading*

Defendants also assert that – even if the statements at issue were not inactionable puffery, as well as forward-looking statements protected by the PSLRA's safe harbor, the First Amended Complaint must be dismissed because Plaintiff fails to allege sufficient factual allegations showing that any statement was false or misleading at the time it was made. The Court agrees.

"A statement is misleading if in light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." *FindWhat,* 658 F.3d at 1305. Thus, by voluntarily revealing one fact about its operations, a duty arises for a corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not "so incomplete as to mislead." *Id. See also Matrixx*, 563 U.S. at 38 ("[T]his materiality requirement is satisfied when there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"). As explained *supra*, Plaintiff's theory of the case is that all of the Defendants 2016 statements and 2017 statements indicating that that there was a strong pipeline for new acquisitions, that the Company was signing of Letters of Intent ("LOI"), that MEDNAX's business model was sustainable, and that the Company could continue acquiring new anesthesiology practices to drive growth, were all false and misleading under the securities laws because these statements failed to disclose to investors that adverse trends were undermining the economics of anesthesiology practices and forcing the Company to reconsider its growth strategy, and the number of acquisition opportunities was dwindling amid the Company's deteriorating reputation among anesthesiologists.

Defendants argue that Plaintiff's allegations "fail[] to adequately plead falsity of the allegedly fraudulent statements" as required by Rule 9(b) and the PSLRA. *See Waterford Twp. Gen. Employees Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CIV-22572COOKEBAN, 2010 WL

1332574, at *11 (S.D. Fla. Mar. 30, 2010).  The Court agrees.  The PSLRA requires "specific facts" showing that each statement at issue was false and misleading at the time it was made. *See In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11-22855-CIV, 2013 WL 3295951, at *11 (S.D. Fla. Apr. 19, 2013); 15 U.S.C. § 78u–4(b)(2).  Here, instead of pleading the required "specific facts" showing that each particular statement was false at the time it was made, the First Amended Complaint simply repeats the same litany of boilerplate allegations—seventeen times—after each of Defendants' statements, asserting that the all statements made by Defendants were false because they omitted the material facts that MEDNAX's strategy was not sustainable because market trends were beginning to emerge that negatively affected the profitability and valuations of anesthesiology practices and these adverse trends, coupled with alleged dissatisfaction of anesthesiologists in already-acquired practices, made it more difficult for MEDNAX to close on anesthesiology deals. *See* ¶¶ 35, 39, 46, 48, 50, 55, 58, 64, 66, 68, 72, 76, 80, 89, 91, 96, 98.  These boilerplate allegations – which Plaintiff applies uniformly to all positive statements made by Defendants for an approximately seventeen (17) month time period do not even come close to meeting the pleading standard for fraud Rule 9(b) and the PSLRA.

Further, with regard to Defendants' 2016 statements, the generic allegations in the First Amended Complaint that the positive statements about MEDNAX's projected growth and the anesthesiology deals in the pipeline were false at the time they were made are belied by the factual allegations in the First Amended Complaint that demonstrate that MEDNAX did in fact throughout 2016 continue to have active revenue growth and closed numerous anesthesiology acquisitions.  For example, the First Amended Complaint makes it clear that the MEDNAX's practice acquisitions for the second half of 2016 (approximately 6) were almost the same as the Company's practice acquisitions for the first half of 2016 (approximately 7). *See* [DE 53] at ¶¶ 61, 71.  Based upon the allegations of the First Amended Complaint itself, the Plaintiff's

32

overreaching attempt to define the Class Period as beginning on February 4, 2016 and to include 2016 statements that were demonstrably true fails from the start.

With regard to the 2017 statements, in addition to the unsuccessful generic boilerplate allegations of falsity described above, the First Amended Complaint also fails to plausibly allege that the statements were false when made. Plaintiff loosely uses the phrase "early 2017" to allege when known adverse trends were affecting Defendants business model pursuant to confidential witness statements, yet the First Amended Complaint simultaneously alleges that Defendants were actively disclosing adverse trends affecting MEDNAX's business model in April and May of 2017, and that those disclosures caused significant price drops in the price of MEDNAX stock. *See* [DE 53] at ¶¶ 78-86.

Here, in similarly fashion to *City of St. Clair*, the Court finds that "[i]t is clear from a careful reading of the entire record that Plaintiff'[s] challenge is based on nothing more than the fact that [Defendant] ultimately reported a loss for the quarter. However, the Securities Act liability exists only for material misstatements or omissions, and not as insurance to investors for any drop in stock price following adverse results." 2016 WL 4705718, at *12 n.7.

### iv.   Failure to plead facts raising a strong inference of scienter

The second element necessary to state a claim for securities fraud under Section 10(b) of the Act and Rule 10b–5 is that the material misrepresentation or omission was made with scienter. *Instituto De Prevision Militar*, 546 F.3d at 1352.

Section 10(b) and Rule 10b–5 require a showing of either an "intent to deceive, manipulate, or defraud," or "severe recklessness." *Mizzaro*, 544 F.3d at 1238. "Severe recklessness" is a term reserved for those highly unreasonable omissions or misrepresentations that involve "extreme departure" from the standards of ordinary care and that present a danger of misleading buyers or sellers which is either known to the defendant or is "so obvious" that the

33

defendant must have been aware of it. *Id.* Pursuant to the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*" 15 U.S.C. § 78u–4(b)(2) (emphasis added). A "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In making the scienter inquiry, "courts must consider the complaint in its entirety," counting any omissions and ambiguities in the complaint against an inference of scienter. *Id.* at 322, 326. The inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences." *Tellabs, Inc.*, 551 U.S. at 323.

Here, even if the First Amended Complaint did not fail for all of the reasons set forth *supra,* it would nonetheless be subject to dismissal for failure to allege facts that would give rise to a strong inference of scienter.

First, Plaintiff's scienter allegations fail at the threshold for failing to adequately allege scienter allegations specific to each of the three individual Defendants, rather than inappropriately lumping allegations of scienter, and for failing to sufficiently set forth factual allegations demonstrating scienter as to each allegedly false or misleading statement based on what facts that individual Defendant knew at the time the statement was made. *See FindWhat*, 658 F.3d at 1296 ("Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute."). Moreover, even setting aside these serious flaws, at most, the First Amended Complaint alleges sufficient facts to demonstrate that Defendants knew that the adverse trends were affecting the continued growth, profitability, and sustainability of MEDNAX's business model since "early 2017." Yet the statements referenced in the First Amended Complaint

34

demonstrates Defendants' public disclosures that those adverse trends were affecting MEDNAX from April 2017 through the end of the class period on July 28, 2017.  Weighing all opposing inferences, the Court determines that it is at least as compelling from considering the facts alleged in the First Amended Complaint in its entirety, including the confidential witness statements, that Defendants were disclosing the adverse trends affecting MEDNAX's profitability and growth as they were becoming aware of the trends and their impact on the Company, negating an inference of scienter. *See Tellabs*, 551 U.S. at 323.

### 2.   Section 20(a) Claim

Under Section 20(a) of the Exchange Act, to state a claim for controlling person liability against a defendant, it must be alleged that the defendant had (1) the power to control the general affairs of the entity primarily liable for the Section 10(b) or Rule 10b–5 violation at the time of the violation, and (2) the power to control or influence the specific policy that resulted in the primary violation under Section 10(b) or Rule 10b–5. *In re Unicapital Corp. Sec. Litig*., 149 F.Supp.2d 1353, 1367 (S.D. Fla. 2001) (citing *Brown v. Enstar Group, Inc*., 84 F.3d 393, 396 (11th Cir. 1996)). Here, because Plaintiff has failed to plead a primary violation under Section 10(b) or Rule 10b–5 of the Exchange Act, the Section 20(a) controlling persons claim must also be dismissed. *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001).

### IV.    Conclusion

Based upon the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  The Motion [DE 62] is **GRANTED** as explained above;

2.  While it does not appear that Plaintiff can overcome the deficiencies identified in the First Amended Complaint, in an abundance of caution, the Court will allow Plaintiff to file a Second Amended Complaint in accordance with the rulings herein on or before October 16, 2019;

3.  The Court takes no position on whether Northern Ireland Local Government Officers' Superannuation Committee would be entitled to remain Lead Plaintiff in this action based on the Court's rulings in this Order.

   **DONE AND ORDERED** in Chambers in Fort Lauderdale, Florida this 2nd day of October, 2019.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

Counsel of Record